Jones, Chief Judge,
delivered the opinion of the court:
The issue in each of these cases is what rate should be paid to the plaintiff for the transportation of jeeps. The plaintiffs are motor carriers.
In the Commercial Carriers case there is the added issue of whether that company is entitled to additional compensation for loading and unloading the cargo.
The jeeps were transported for the War Department during the year 1942.
Both plaintiffs operated during the period involved under land grant equalization agreements which stipulated that the shipments would be made at “the lowest net land grant *389 charge lawfully available on such shipment from origin to destination at the time of the movement * *
During the year 1942 large quantities of jeeps were transported from the factories at Detroit, Michigan, and Toledo, Ohio, by rail in boxcars and by motor carriers. No new jeeps were permitted by the War Department to be shipped from either factory on flatcars for two stated reasons, (1) flatcars were in short supply and under orders of the Quartermaster Corps flatcars were reserved for moving tanks and other armament which could not be shipped in boxcars or by motor carriers, and (2) the Bureau of Ordnance refused to allow the shipment of new, assembled jeeps in flatcars because of the possibility of pilferage or damage to the vehicles during shipment.
In early 1942 the Ford Company loaded seven new jeeps on a flatcar in an effort to show the Government’s chief inspector at the factory that jeeps could be shipped in that manner. But the inspector directed the company to remove the jeeps from the flatcar and to load them in boxcars.
Clearly in the circumstances flatcar service was not available at that time and the rates for that type of shipment would not govern.
As a matter of fact the rates for shipment in boxcars and flatcars of equal length were the same. The rate was not based upon the number of vehicles shipped but on the weight of the shipment. The only variation in shipping costs occurred when the total number of jeeps shipped in a car weighed less than the established minimum weight for a car. Thus if 12 jeeps were shipped in 50-foot boxcars it would require two cars. If they were shipped in 40-foot cars it would require three cars. There would be no difference in the rate as to ten of the jeeps but in 40-foot cars the third boxcar would contain only two vehicles, which would make the rate somewhat higher for the partially loaded car.
The amount due each plaintiff should be computed by taking the total number of jeeps that were shipped on any one date from a given factory to one destination, irrespective of bills of lading used, and applying to the lot the net land-grant rates then in effect for the shipment of such vehicles in boxcars, either five or six to the car.
*390 Thus, if 66 jeeps were transported from Dearborn, Michigan, to Atlanta, Georgia, on the same day there would be no extra charge because that number could be shipped in 11 fully loaded boxcars 50 feet in length. If the number shipped in the same way was 65 they could be shipped in 13 fully loaded 40-foot boxcars. In neither event would there be any extra charge.
On the other hand if the number shipped on the same date between the same points had been 68 vehicles, the number would not be divisible by either five or six, and there would be a slight adjustment upward for the one partially loaded car.
We reject plaintiffs’ contention that the individual bills of lading should govern. These were done as a convenience to the employees of the Government, who prepared the bills of lading, because the bills were typewritten and only 14 vehicles could be listed on a single bill. There were some bills that listed a different number, although most of them listed 14 vehicles. Manifestly they did not show the number of vehicles transported by the carrier from the factory to the same destination on any particular day. They were frequently shipped by scores and even hundreds. During the years 1942 to 1944, inclusive, according to official records of which we may take judicial knowledge, the two factories shipped more than 500,000 jeeps to the Army from Detroit and Toledo.
Both plaintiffs originally claimed additional compensation for loading and unloading the jeeps on the ground that these services would not have been included in the rail services had the vehicles been shipped by rail. Later the United Transports, Inc., dismissed this part of its claim.
The Army contracts for the procurement of jeeps from Willys-Overland and Ford companies provided that the manufacturer would load the jeeps for transportation from the factories without additional cost to the Government. The actual loading was done by employees of the factory.
The Army installations at destinations had crews available who unloaded the cars when shipment was by rail, and these crews were available for unloading the jeeps moving by *391 Commercial Carriers. Thus the unloading by plaintiffs’ drivers saved the defendant nothing.
We think that in the circumstances separate loading and unloading charges should not be allowed.
Plaintiffs will be given judgment computed by taking the entire lot of jeeps transported on the same date to the same destination, without regard to the number of bills of lading used, and applying to that particular day’s shipment transported by one carrier from one factory to one destination using either five or six vehicles to the boxcar, whichever will produce the lower rate.
Entry of judgments will be suspended pending the filing by the General Accounting Office of a report showing the amounts due in accordance with this opinion.*
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs brought these actions separately for the recovery of transportation charges claimed to be due for the transportation of jeeps for the War Department during the year 1942. Since both cases involve the same issues of fact and law, they were consolidated for trial by agreement of the parties.
2. The plaintiff Commercial Carriers, Inc. is a Michigan corporation, with its principal place of business in Detroit. The plaintiff United Transports, Inc. is a Delaware corporation, with its principal office and place of business in Oklahoma City, Oklahoma. Both corporations were engaged in transporting motor vehicles over and upon public highways as motor carriers under and by virtue of certificates of public convenience and necessity issued by the Interstate Commerce Commission. At all times pertinent to this action, both of the plaintiffs had on file with the Interstate Com *392 merce Commission, and in effect, tariffs which fixed rates and charges for authorized services performed by them.
3. When the United States entered World War II, the manufacture of automobiles ceased and the traffic carried by plaintiffs thereafter consisted principally of military vehicles. At the beginning of the war, military vehicles were shipped almost entirely by rail, because the land-grant rates applied to rail shipments. In order to compete with the rail carriers, many motor carriers requested that they be allowed to enter into land-grant equalization agreements with the Government.
During the period involved in these suits, both plaintiffs operated under Standard Motor Freight Land-Grant Equalization Agreements with the War Department. These agreements provided in pertinent part as follows:
1. The undersigned carrier agrees or, if more than one are undersigned, they agree jointly and severally, in connection with any shipment of Government property transported from origin to destination exclusively by him or by any one or more of them, to protect the Government of the United States against any cost in excess of the lowest net land-grant charge lawfully available on such shipment from origin to destination at time of movement derived from lawful rates of common carriers filed with the Interstate Commerce Commission or appropriate State commission.
4. During the months of March and April 1942, each of the plaintiffs transported large numbers of jeeps for the War Department from the Ford Motor Company, Dearborn, Michigan, and the Willys-Overland Company, Toledo, Ohio, to various Army depots and installations in the South. The shipments moved on Government bills of lading in interstate commerce. In each instance, plaintiffs were paid for the transportation of the jeeps at the rates applicable to the transportation of passenger vehicles. Thereafter, on audit by the General Accounting Office, these payments were disallowed, and settlements were made with the plaintiffs on the basis of the land-grant rates applicable to the transportation of jeeps, classified as freight vehicles. After the plaintiffs instituted these suits, the Court granted their separate motions for summary judgment, holding that the *393 jeeps should be classified as passenger vehicles but suspending the entry of judgments pending a determination of the amounts due.
SHIPMENTS IN BOXCARS OR FLATCARS
5. During the period when plaintiffs transported the jeeps involved in this action, large numbers of new jeeps, assembled and uncrated, were shipped from the factories of the Ford Motor Company at Dearborn, Michigan, and the Willys-Overland Company at Toledo, Ohio, by rail in boxcars and by motor carriers. The jeeps were procured under contracts issued by the Quartermaster Corps, which also arranged for the transportation of the vehicles. Prior to shipment, the jeeps were inspected by the Bureau of Ordnance which had inspectors stationed at each of the factories.
Representatives of the Quartermaster Corps had orders from the Bureau of Ordnance not to permit the shipment of any new jeeps from either of these factories in rail flatcars. Although the evidence does not establish that these orders were in writing, the undisputed evidence shows that the War Department would not, and did not, permit the shipment of such assembled new jeeps from either of the factories in rail flatcars during the period when plaintiffs were transporting the jeeps listed in plaintiffs’ petitions. No new jeeps were shipped from either factory during that period on rail flat cars with the exception of unassembled jeeps, which were packed in boxes and shipped for export. At the time, rail flatcars were in short supply, and the orders under which the Quartermaster Corps acted were issued pursuant to a War Department policy, which required that the flatcars be reserved for moving tanks and other heavy armament which could not be transported in boxcars or by the motor carriers.
In addition, the inspectors of the Bureau of Ordnance refused to allow the shipment of new, assembled jeeps from the factories in open flatcars, because of the possibility of pilferage and damage to the vehicles during shipment. During the Spring of 1942, the Superintendent of Shipping for the Ford Motor Company loaded seven new jeeps cross-wise on a rail flatcar in an effort to show the Government’s chief inspector at the factory that the jeeps could be shipped in that manner. *394 The inspector directed the Superintendent of Shipping to remove the jeeps from the flatcar and to ship them in boxcars, stating that shipment in flatcars could not be permitted because of the possibility of pilferage and damage to the vehicles during the movement.
6. If the representatives of the War Department, who were in charge of inspecting and transporting the jeeps, had permitted it, new jeeps could have been shipped from the Ford Motor Company and the Willys-Overland Company in rail flatcars, seven jeeps to a car, at the time pertinent to this action. During the Fail of 1942 and thereafter, jeeps were frequently shipped from Army supply centers and camps to other Army installations on rail flatcars. From seven to nine jeeps were moved on the flatcars, depending on the method of loading. Seven jeeps were shipped in flatcars when the vehicles were loaded cross-wise on the car. Eight to nine jeeps were shipped in some flatcars by loading them on the cars two jeeps abreast and four along the length of each car. In order to ship the jeeps in flatcars, it was necessary to remove the spare tire and front bumper from each vehicle.
7. Each vehicle used by plaintiffs for transporting the jeeps had the capacity to carry six jeeps at a time. Each order issued to plaintiffs for the movement of the jeeps generally covered a large number of vehicles to be transported to a specified destination. Frequently, the number of vehicles covered by an order was not divisible by six. In moving the jeeps, plaintiffs loaded their units to full capacity, except for the last load, which would include from one to six vehicles. Regardless of the number of jeeps to be moved under a single order, the representatives of the War Department, in most cases, issued bills of lading listing only 14 jeeps. This was done as a matter of convenience to the employees of the Government who prepared the bills of lading, because the bills were typewritten and only 14 vehicles could be listed on a single bill. There were a number of bills of lading which listed less than 14 vehicles.
The lowest net land-grant rates by rail were not based on the number of vehicles shipped but on the weight thereof, the rate being stated at a specified figure per 100 pounds. *395 The rates for shipments in boxcars and flatcars of equal length were the same. The only variance in shipping costs occurred when the total number of jeeps shipped in a car weighed less than the established minimum weight, because the tariffs required payment of charges up to the specified minimum amount when the commodities tendered for shipment fell below the established minimum weight for the car. These minimum charges were based on boxcar sizes and did not vary between boxcars and flatcars of the same length. The established minimum weights were 10,000 pounds for 40-foot cars and 12,500 pounds for 50-foot cars. A shipment of less than five jeeps in a 40-foot car and of less than six jeeps in a 50-foot car constituted less than the established minimum-weight load and required payment of charges in the same amount as for the established minimum. A 40-foot boxcar customarily carried five jeeps per car and a 50-foot boxcar usually carried six jeeps. A 50-foot flatcar, which had the same established minimum weight as a 50-foot boxcar, could be loaded with from seven to nine jeeps.
LOADING AND UNLOADING CHARGES
8. In their petitions, both plaintiffs claimed additional compensation for loading and unloading the jeeps transported by them, on the ground that these services would not have been included in rail services had the vehicles been shipped by rail. After its motion for summary judgment was granted, United Transports, Inc. moved to dismiss those paragraphs in its petition wherein it claimed additional compensation for loading and unloading, and the motion was granted.
9. In the tariffs which Commercial Carriers, Inc. had on file with the Interstate Commerce Commission at the time the services in suit were performed, loading and unloading services were included as a part of the rates and charges for the transportation of the vehicles. The drivers who operated plaintiff’s transportation equipment loaded the jeeps at the factories and unloaded them at places within Army camps or depots as directed by the Army officer in charge. *396 Plaintiff’s drivers were paid to load and unload the vehicles, and they were required to undergo a period of training in order to be able to load and unload the vehicles safely and undamaged.
The loading of jeeps aboard the carriers consisted of driving three jeeps on the lower level of the carrier, lowering a ramp from the upper tier and then driving aboard three additional j eeps. The unloading of the j eeps was performed by the driver by driving off the three upper jeeps, raising the ramp, and then driving off the remaining three jeeps from the lower tier. Plaintiff’s drivers were responsible for the jeeps until they were accepted by the Army receiving officer. Consequently, the drivers would not permit other persons to load or unload the jeeps from the carriers.
10. The Army contracts for the procurement of jeeps from the Ford Motor Company and the Willys-Overland Company provided that the manufacturer would load the jeeps for transportation from the factories without additional cost to the Government. When the j eeps were loaded aboard railroad cars, the loading was performed by employees of the manufacturers and the expense was borne by them.
11. When jeeps were shipped to Army installations by rail, they were unloaded from the railroad cars by a crew of workmen, regularly maintained in such installation by defendant. These workmen were available for unloading the jeeps moved by Commercial Carriers, Inc. and, therefore, the unloading of the jeeps by plaintiff’s drivers saved defendant no costs.
12. Charges for loading and unloading are accessorial charges and are not usually included in tariffs fixing rates for transportation. During the period pertinent to this action, no carriers by rail had tariffs on file which authorized charges for loading and unloading carload lots. However, the rail tariffs on file provided that where pickup and delivery service was performed on less-than-carload freight, the carrier was authorized to charge three cents per one hundred pounds for pickup and loading and a similar charge for unloading and delivering to the shipper. As stated above, the tariffs under which Commercial Carriers, Inc. operated did not provide separate charges for loading and unloading.
*397 13. Aside from the rail tariffs which authorized additional charges for pickup and loading and for unloading and delivering on less-than-carload lots, there is no evidence as to the cost or reasonable value of the loading and unloading services performed by plaintiff, nor is there any evidence as to the number of less-than-carload lots transported by plaintiff.
14. The total actual weight of the jeeps transported by Commercial Carriers, Inc. was 1,741,516 pounds. If it is held that Commercial Carriers, Inc. is entitled to additional compensation for loading and unloading the jeeps transported by it at the rate of six cents per hundred pounds, the amount recoverable for such services would be the sum of $1,044.91.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that Plaintiffs Commercial Carriers, Inc., and United Transports, Inc., are entitled to recover the difference between the amounts they have been paid for the shipments in issue and the amounts they would have received had they been paid at the net land-grant rates applicable to the shipment of passenger vehicles by rail.
The amount due each plaintiff is to be computed by taking each lot of jeeps transported on the same date from a given factory to the same destination, irrespective of the number of bills of lading used, and applying to the lot the net land-grant rates then in effect for the shipment of passenger vehicles in rail boxcars, loaded either on the basis of five vehicles per car per lot, or loaded on the basis of six vehicles per car per lot.
Entry of judgment is suspended pending the filing by the General Accounting Office of a report showing the amount due each plaintiff in accordance herewith.
The court further concludes that Commercial Carriers, Inc., is entitled to recover nothing on its claim for loading and unloading charges, which claim is hereby dismissed.

 Judgments May 3, 1965.